Good morning, everyone. Our first case up for oral argument this morning is case number 25-1738 and 25-1872, Penske Truck v. Central States. Good morning, Ms. Faske. Good morning, Your Honors. May it please the Court, Sarah Faske on behalf of Penske Truck Leasing. In 2021, Central States voted to expel one of Penske's bargaining units with the aim of overcharging Penske at least $10 million. Neither the trust agreement nor ERISA permit this attempted expulsion. The District Court erred. Ms. Faske, could I ask you early on here, as I understand it, all you're seeking at this point is declaratory relief? We're seeking a judgment that Central States exceeded their authority in the attempted expulsion and that their December 14th, 2021 decision is impermissible and unlawful. The answer is yes. Yes. Thank you. And if I understand your position correctly, you think we should not exercise jurisdiction over the trustee's counterclaim, but we could rule in your favor. They think we shouldn't exercise jurisdiction over your claim, but can rule in their favor. Could you help me out on the scope of jurisdiction here? Of course, Your Honor. Penske's claim that any attempted expulsion is beyond the trustee's, the trust agreement authority, falls under the Labor Management Relations Act, Section 301. And that law permits this court to opine on whether or not, and the interpretation of a most concrete, however, if the trustees were to assess withdrawal liability against you, correct? And that would then be funneled towards arbitration before you could bring these issues back to court. There are other harms, Your Honor, beyond just the, beyond the withdrawal liability. Specifically, Penske and its union negotiated for, to participate in Central States under its agreement. And that was something that Penske and its employees expected would last through the duration of the contract. So the expulsion here also creates harm to Penske because there is a question of whether or not our employees could accrue benefits, accrue vesting credits during this time. So the expulsion itself is different. Well, there's a question, as I understand it, about the status for kind of the three months that the TRO was in effect before it was vacated, right? And about the payments that you all made during that time. There is not yet a ripe question about that issue because Central States has, there's no partial withdrawal liability assessment yet. And so really what we have is, you know, figuring out what the status of the payments for the, under the temporary restraining order, that's really not, before the court, it's not ripe at this point. Why doesn't that analysis apply to everything? Nothing is ripe right now. Respectfully, no, Your Honor. Because there is a question of whether or not the expulsion, does Central States, do the trustees have the authority under the trust agreement to expel us? That's an interesting question. The question is what effect would an answer to that question have? So it could dispose of the entire dispute, a ruling in Penske's favor. What practical effect? What relief? I'm trying to understand, not whether there's an interesting debate here, but whether there is a question that we need to decide now that will affect you and your clients or the trustees. Yes. A decision now under, about whether or not the trustees exceeded their authority in the expulsion decision impacts my client, both because of a concern about ongo, about our participation and whether or not we get the benefit of our bargain with the union and whether or not we can continue to participate in the union. Whether our, you pulled out of everything. In March of 2022. Right. So this, this is all, and that's more than three and a half years ago. So what effect today would the declaratory judgment you're seeking have? Today, it would help establish whether or not our employees, were participating in the union, in the pension benefits during this time. I can understand how an employee might be upset with either side and might be seeking relief, but I don't see any of them in this case. Let's, let's, let's, why don't we, we move on off this question of jurisdiction, since this is not terribly fruitful. Can you tell us if your client relied in any way from December of 21 to March of 22 on the existence of the TRO? Because the TRO was in place, Penske continued to contribute to the pension fund. We also frankly had no notification from central states that there was ever any attempted expulsion here or that they tried to act on, on the expulsion after the district court denied our motion for a preliminary injunction. And so yes, we did continue to contribute to central states for these, the people in this local 745 group from frankly, 1980 through until 2022, until March of 2022, when Penske affirmatively withdrew. Could you tell us what position you took on the issue of the bond in the district court? Penske did not take any position on the, on the bond. The, during the injunction briefing, central states asked for a $150 million bond, submitted declarations in support of that. The district court ultimately determined that the bond was not warranted. Penske did not, I think Penske said that $150 million was unwarranted. But other than that, you know, that really wasn't a substantive position Penske took, but also not particularly relevant to this court's decision. Now the bond decision was made in the preliminary injunction decision was not appealed to this court. I'd like to focus. I want to go back to follow up on something Judge Hamilton asked earlier. If a determination of withdrawal liability is made by central states and the case proceeds to arbitration, would you have the ability there to raise the expulsion provision argument that you were arguing before us now? We would be able to argue that the attempted, that the expulsion was improper, I believe, because we could try to contest it there. I think, I don't want to be said here that I'm waiving that argument. But really the, the arbitration would come as to the propriety of the assessment and whether or not it was authorized. So that would be kind of down the road if central states ever assesses it. I'll point out it's been three years we haven't gotten an assessment. And at this point we have a, a decision that under the trust agreement clause, respectfully, the district court missed some key phrases in the, in the trust agreement that would prevent. Before we get there, one more question for you before we get to the merits of the clause or the language. You responded to one of Judge Hamilton's questions about this case and what it's under and you respond with the LMRA. Are you proceeding under any specific section of ERISA? That was raised in central state's brief, wasn't really addressed in the reply. The briefs are full of ERISA citations and ERISA law, but no specific statute or provision in ERISA that you're proceeding under. So can you please clarify that? Of course. We have a claim under Section 301 of the Labor Management Relations Act. And part of that, and whether or not our claim, whether the trustees exceeded their authority, does, ERISA does impact that analysis. Because as multiple circuit courts have held, the district court, or rather the trustees, can't use their own documents to expand their scope beyond what ERISA permits. So it impacts how, how we construe or how we look at the LMRA, but you're not bringing a separate ERISA claim? Correct. There is not a separate ERISA claim in this action. Thank you. Really looking, focusing on the language of the trust agreement. It provides that the trustees are authorized to reject any collective bargaining agreement, participation agreement, or other agreement. That's clause one. Or clause two, terminate the participation of an employer and all contributions from the employer. Period. Full stop. That is the limit of their authority in this provision. And the rest of the section, clauses three and four, just go to what happens next if the trustees proceed under clause one. What standard are we reviewing this under? I'm sorry? What standard are we reviewing this under? So whether or not the trustees are able to expel a single bargaining unit without rejecting a collective bargaining agreement, participation, or other agreement is reviewed de novo. Their decision to do so, or their decision to interpret any ambiguous clauses, that would be reviewed arbitrary and capricious. But there is no ambiguity in clauses one and two here. It provides the limit of their authority, period. And the district court, in determining and holding that a single unit expulsion is permitted, expanded the scope of the authority in the trust agreement and did not understand, I think respectfully, that there can only be an expulsion of a single bargaining unit if it's predicated on the rejection of an agreement. And the central states, the trustees' decision here, simply said they had the authority to expel the local 745 group. Does the standard of review vary given that you've clarified you're proceeding under the LMRA as opposed to ERISA? No, Your Honor, it does not. It's the same. Because we're still looking ultimately at contract interpretation questions. And so the trust agreement is the contract to which Penske has agreed. And the contract has to be interpreted for what it is. Would the arbitrary and capricious standard for application of it still apply under the LMRA? Yes, because under the trust agreement, the trustees have the authority to interpret and apply the agreement. So yes, the actual expulsion decision would be under the arbitrary and capricious standard. But looking at the standard of review for can they expel a bargaining unit without rejecting a CBA participation or other agreement, that's a de novo review. And respectfully, that's one of the ways that the district court erred here is because the district court jumped directly to the arbitrary and capricious. I would like to reserve the remainder of my time for rebuttal. If I could, I would like to ask you a question, however. I assume you'll get some extra time on this. On the arbitrary and capricious points that you've made, you've cited a number of cases involving trustees' denial of benefits or termination of benefits to people to whom they owe fiduciary duties. Is there authority that says they owe a similar duty to you? So there is not specific authority, no, Your Honor. I think where we are coming from this is that those decisions, they're all about how the trustees are making their decisions under the arbitrary and capricious standard. And in many of those cases, there's no discussion of fiduciary duty anyways. It's taken for granted when you're talking about beneficiaries. But when you're talking about employers, what I'm getting at is that the rhetoric of your brief is all about how they're trying to artificially inflate liability. You've continued with that today. I don't see anything artificial or natural here at all. I see two opposing parties, counterparties in a contract, each trying to act in their own best interests. So there is nothing, ERISA has no rule against a fund trying to maximize its withdrawal liability within the constraints of the trust agreement and ERISA. Right. So let me go back to, you want to apply the arbitrary and capricious standard, you want to review the procedures they used to make their decision, whether they sufficiently explained it and so on. Where does that duty come from? That duty comes from the fair administration of a pension fund, these are all its employers. And where is that? So it does come from the idea in section 1394B, where all planned rules and amendments under this part shall operate and be applied uniformly. There is an idea in, and actually it came up- This seems to be a long and new stretch you were trying to make in this case to impose a level of scrutiny on behalf of an employer for the trustee's internal decision-making processes and thoughts that I assume they could not apply to your decisions about when you want to terminate collective bargaining agreements or let them expire. Respectfully, what we have here is, and using those benefit cases to illuminate the one-sided myopic focus and what happened when- So who's one-sided myopic focus? The trustees, your honor, because the trustees, they violated their own procedures. They said, before we're going to expel, we're going to do these things and they didn't do that. Why do you have a right under the law to insist that we review those kinds of claims? That's what I haven't heard yet. I heard you say there's no authority. So I'm inviting you to develop the argument. So the reason is that we are parties to this trust agreement and in the D.C. Circuit Court's decision recently in M and K, the court talks about how the trustee's policies have to be applied fairly amongst all the employees. Which case is that? M and K solutions. It's currently, it's just decided by the D.C. Circuit last year, I believe, and is actually on appeal at the Supreme Court right now. Okay. Thank you. And so we have this idea that the trustees have to be able to administer their fund fairly vis-a-vis all employers. And that's where, unfortunately, they fell short here because of the targeted nature of this expulsion. So out of 1394B, you infer judicial review of internal trustees' processes, decision-making, sufficiency of their explanations. It is partially that, your honor. But it's also this idea that if we're going to have a review of a decision, which there is a review of these decisions, and it is reviewed arbitrarily and capriciously under the trust agreement, we need something to help us illuminate what that looks like. And to your point, all of the cases that have developed in this area come under the benefit denial situation because there aren't that many cases where employers are challenging an expulsion. But what we have and what we're looking for here is what does it mean to make an arbitrary and capricious decision. And so we're looking at those benefit cases to help illuminate and elucidate what that standard is here. All right. We'll give you some time on rebuttal, Ms. Bass. Thank you, your honor. Thank you. Mr. Sullivan, before we get there, I can't see who's sitting behind the computer. We're getting your team's messaging showing up on the screen. Thank you. Nope, that's okay. Great, thank you. Mr. Sullivan, whenever you're ready. Good morning, everyone, and may it please the court. My name is Daniel Sullivan. For the record, I am here today on behalf of the Appellee and Cross-Appellant Central States Pension Fund and its trustees. I would like to start with the general topic of jurisdiction as first raised by Judge Hamilton. It is our position, as stated in our jurisdictional statement in our response, that there is no risk of jurisdiction here. Federal courts are courts of specifically delegated jurisdiction, and there was no specific jurisdictional invocation of ERISA in the complaint or in any subsequent filing. What implications would that have? Because there is subject matter jurisdiction, given that it's brought under LMRA. That is correct, your honor. The upshot of that is, in addition to being conceptually distinct from withdrawal liability, as I'll get into in a moment, there's also a legal cut and dry distinction here. To say that these are determinations made under that subpart of ERISA, such that the arbitration requirements of 1401 apply, seems to me to be an even greater stretch when ERISA itself is not even invoked in the lawsuit. That's for your counterclaim. That is correct. So what would the implication of your argument be for what Penske is pursuing? It doesn't seem like it matters there, because we have subject matter jurisdiction. Nobody's challenging that. They've admitted they're not pursuing a specific claim under ERISA. We do have a lot of ERISA case law cited. But I'm not sure I understand, for their claim, what are the implications of that? That is correct, your honor. I'm focused on our counterclaim. When I say that, the only caveat I would provide is that if the decision is made that our claim is too close to withdrawal liability and thus must be dismissed, I think that both claims are so similar that to ascribe this jurisdictional bar to one claim or the other is the problem. But otherwise, I'm just trying to comply with my duty under the circuit rules to be very forthright about jurisdiction. That's all. The other thing I'd like to point out is one thing that came out at the beginning of opposing counsel's statement. I don't think it's accurate to say that the trustees made a decision to expel the local 745 group. It is critical to understand that their decision was conditional, that they decided that unless the trustees received a communication from Penske that a 2022 withdrawal of the 745 bargaining unit would be considered a 2021 withdrawal, that in that instance, then 745 would be expelled. I think that's critical. That's a narrowly tailored species of relief here. We essentially gave Penske the opportunity to prove that this isn't a strategy to reduce withdrawal liability, and their actions made it apparent. I admit fully that it would be a tougher case if the trustees just said 745 is out. I still think it would be defensible in that case. I think that the amount of discretion given under the trust agreement is sufficiently broad to support that outcome, but that is not the outcome that we're talking about. That distinction might matter in your application of the trust agreement to the ultimate decision, but how would that decision or distinction matter in the interpretation of the trust agreement in the first place? If I may clarify, you mean if we're looking at that paragraph that we're talking about? We're looking at the expulsion provision. You've argued that there's a distinction here. This was a conditional expulsion. If we're looking at arbitrary and capricious and whether or not your decision to ultimately expel them was arbitrary and capricious, that's a separate argument than whether or not you had the authority to do so in the first place. I understand and agree. I would say that the power to make a expulsion decision conditional would be provided by the more general powers and other provisions of the agreement. I apologize. I don't have them at the tip of my fingertips, but they're in the brief. To do all acts that are necessary. Do you have it? I apologize. Do you have it? I would love for you to point us to where that language is. I don't have it in front of me. I do apologize, Your Honor, but I can provide a letter afterwards. I mean, I apologize. It's just stage fright. I understand. I understand the question. I assure Your Honors there is language in the trust agreement for the general proposition that— Did you bring it in the courtroom today? I may have. We don't leave some of the stage fright. If you want to take it, go ahead and grab it. I mean, that's the million-dollar question today. We're not just doing theater. We're actually trying to get these questions answered. I do understand, Your Honors. I believe my co-counsel is— Is your argument that this other provision, we'll see if your co-counsel can find it, just gives a lot of general flexibility? I didn't see anything in any provision that had conditional expulsion language. I understand the point. And yes, that is basically what I'm saying, that there is a penumbra around certain of the powers within the trust agreement. However, I would also point out that the power to expel is greater than the power to conditionally expel, and it would be a strange result to say that you have the power to kick them out together, but you don't have the power to give them a chance to show that they intend to stay in the fund and so on. But we have to make a determination of whether the language in the expulsion provision allows either in the first place. And Pinsky is focusing our attention to the notion that there was no collective bargaining agreement at play at the time of the expulsion. So looking at the expulsion language, where is the authority coming from? The authority to reject a collective bargaining agreement does come from that. And the Seventh Circuit's decision in central states, southeast and southwest areas pension fund versus trans-service holdings makes clear that a collective bargaining agreement can expire without terminating, that the obligations under that agreement can survive and exceed its stated expiration date. In this case, that was the case with the collective bargaining agreement at issue. I would also like to push back a little bit at something that Pinsky stated about trying to create this great division between rejecting a collective bargaining agreement and terminating an employer. An employer, for purposes of ERISA and for purposes of the trust agreement, is defined by its obligation to contribute. So to reject an employer is often to terminate a collective bargaining agreement, and to terminate an employer, or at least the bargaining unit of that employer. Because you cannot be an employer unless you are also contributing to the pension fund, or at least obligated to do so. Employer has a very specific meaning in the trust agreement, which does not include a unit of it. It includes Pinsky as a whole. I think that is a plausible reading of Article I, Section 1, and that definition of employer. I believe that this sort of technical reading does not follow from reading the paragraph in Article IV, Section 20 as a whole. Article IV, Section 20 as a whole does have two sentences at the end where it speaks about affected units. And by speaking about terminating specific agreements, it follows that the upshot of an agreement is the termination of the contributions due on behalf of the employees who are subject. But the power given in the expulsion provision is to terminate the participation of an employer. An employer is specifically defined in Article I, Section 1 in such a way that it's not a  It is the Pensky as a whole. That is why I would focus on the and or language of and or reject and terminate an agreement. I believe that when one looks at that concept in conjunction with the fact that an employer under ERISA and under the trust agreement, yes, is usually discussed as a single entity, but is described as a counterparty to a labor contract. And here to terminate those agreements or to reject those agreements, excuse me, has the effect of conditionally terminating the local 745 group. I would like to move then, Your Honor, to talking about the rest of the decision itself, the record. Before we do that, are you able to locate that language? I believe we're going to need some more time here. I'm no problem. I do sincerely apologize. I would like to just move to a couple of points about the administrative record itself. As to the point about procedures and so on, there is information within the administrative record that is sufficient to support a termination decision in this case. Specifically, the trustees looked at the number of full-time equivalents that were employed by the various bargaining units. Before we get there, I have one question for you. We were just talking about the expulsion provision. In interpreting the trust agreement under the LMRA, what is your view on the standard of review for the interpretation of the agreement itself? We're not talking about ERISA. We're talking about LMRA. The standard of review is whatever is provided by the contract. So by default, that would be de novo. But because here the power under Article IV, Section 17, includes the power to interpret the trust agreement, that would trigger arbitrary and capricious review of the other provisions in the trust agreement. Okay. I'm not sure I understood. For interpreting the expulsion provision, is it de novo review or arbitrary and capricious given that the claim is under the LMRA? It is arbitrary and capricious. The other aspects of the record reflect far more than the low minimum that is required for an arbitrary and capricious decision. Here we have also a look at the statements that were provided by Penske. We have a look at the statements that were provided by the various local unions. We have a description of some high-level survey-type data of other CBAs that were received at the same time. Enough information for the trustees to reasonably conclude that one of the other clauses within the Article IV, Section 20, specifically relating to economic harm and so on, were fulfilled. So I do not agree that the record reflects any sort of bias or any sort of poor investigative process. I'd also like to add that by creating a contract in which the trustees are delegated a significant amount of discretion to reach their decisions, employers who joined the fund or founded the fund or so on, weighed the difference between a trustee body that operates according to very stringent standards or one that has more discretion. So I don't agree with the implication that Penske has raised that this sort of discretion is an anti-employer provision. Employers such as Penske have entered into the trust fund of central states with eyes wide open. I'd like to just briefly touch on my counterclaim, Your Honors. Our position here is that there is jurisdiction for the district court to have found in our favor on this issue. As to Judge Hamilton's question, I believe at the beginning of oral argument, I understood it as sort of a standing question. I mean, what's the issue? What's the right dispute? We have a fundamental duty to administer the fund, which means we have to find out what is owed to us and what we owe to our beneficiaries. That comes from central transport, the Supreme Court case. I would also add that members of the fund accumulate pension credit based on the time that they worked subject to a collective bargain agreement. So even if an employer never pays those contributions, we are required under ERISA to pay them or exercise due diligence in trying to pay them and so on. So we do have a live interest in trying to figure out what our obligations are for work that was performed after December of 2021. And that is ultimately what we are asking for the court to decide. Okay. So how would a decision retroactively terminating Local 745's participation under the agreement affect those employees? They would not receive pension credit for work performed after, I believe, December 25, 2021 is the date. Okay. And what would they have? Would they get some other form of credit for the work they did? Not with central states pension funds, no. So do they need to be in this case? They do not need to be in this case because this case is chiefly about Penske's obligations to us. But they certainly would, you know, in the ordinary course, have a cause of action against the pension fund to challenge a decision that we made. And that decision would be subject to the same kind of review here with perhaps the asterisk that Judge Hamilton has referred to before about conflict of interest and so on. What is, in a lot of different ways, courts encounter problems with the consequences of decisions that are issued by a court and then later vacated. And you all did not push or insist anyway on a bond in this case on the TRO. You asked for it, but you didn't push for it after the district court refused. That, as I understand our law, means you can't get damages for a wrongful injunction. What other form of relief would be available to you with respect to the vacating of the TRO? I am out of time, but I would like to answer the question. Our time may be a little limited. As I say, this is not the theater. We're trying to get answers. I understand, Your Honor. The primary relief that we're requesting is a declaratory judgment. If we don't get a declaratory judgment, then I understand what Your Honor is saying. There's the Bank Direct case. I would… Bank Direct case does say that, you know, your damages are typically limited to a bond. We think this is an unusual case because a bond wasn't considered. However, I think that there is a reading that harmonizes everything, which is that the district court said you get a $0 bond because I just vacated the TRO, and it's therefore a legal nullity for the purposes you're worried about, and therefore you have no damages. I think a ruling to that effect would harmonize everything. I apologize, Judge Hamilton. Is there a part of your question I missed? I would like to address Judge Pryor's question. That I want to hear, too. So, go ahead. So, and again, Your Honor, I do genuinely apologize. The language I'm speaking about appears in Article 4, Section 14E of the trust agreement. It states to… it empowers the trustees to, quote, do all acts whether or not expressly described herein which they may deem necessary or proper for the protection of the property held hereafter. Thank you. Could you tell us the status of the attorney fee award? Penske has paid us the attorney's fees that we applied for. So, I frankly wasn't entirely sure what the Northern District of Illinois wanted me to do with my motion, but we are fine with that. We just would want our attorney's fees for this appeal as well. Um, would you agree that if we rule in your favor that Penske would be due a refund for the contributions they made for December of 21 through March of 22? I do not know, and the reason that I do not know, Your Honor, is because the trust agreement language states that refunds are only due upon a finding of the trustees of a mistake of fact or a mistake of law. Well, look, if you're going to claim the termination as of December of 21, December 25th of 21, I don't see how you can have your cake and eat it, too. I take the point, Your Honor. If I may add just one asterisk, there was a payment that was made after the TRO was vacated, and our position would be that even with that… That's a nuance. I'm not so interested in. I'm more concerned about the disputed three months or so here. You know, in that case, Your Honor, I think they would have as good of a case as I'm allowed to say without infringing on the trustee's authority for a refund if they applied for it and so on. We do expect lawyers to be able to… Well, until I see an application, Your Honor, I don't want to promise anything. Understood. Unless there's anything else, I thank the Court for the time and their patience. Thank you very much. Okay. Thank you.  Ms. Vask, we'll give you two minutes. So, Your Honors, I think that your skepticism about the general provision in the trust agreement is warranted. That general provision doesn't overrule the specific limitations of the trustee's authority. And ultimately, the fact that it's pretty bedrock Seventh Circuit law, the fact that the decision was conditional also, I don't believe, changes the analysis. They're still looking to expel a single group without doing the rejection of a collective bargaining agreement, participation agreement, or other agreement. And additionally, the trustee's reliance on the idea that they are on the trans-service matter is also not relevant here. Because trans-service was all about, excuse me, about an evergreen provision. Can an agreement roll over from year to year under the terms of the agreement? And that's certainly not what we have here. Instead, there's actually, you know, we have the Supreme Court in advanced lightweight concrete has held that when a collective bargaining agreement expires, it's gone. And the only thing, though there may be a duty to continue to contribute to the pension fund under the status quo obligations of the National Labor Relations Act, there is not a collective bargaining agreement in place anyway. So for them to say, we know that our decision said that we have the authority to expel your unit, but we're going to give you a post hoc explanation about how, we didn't actually just kick you out, expel you, we terminated the CBA that doesn't exist anymore, or the participation agreement that we didn't write in the decision in the first place, that's beyond the scope of their authority. Additionally, on the standard of review issue, in this court, Anne Gustafson has held that first we look at whether or not the trust agreement permits the permitted action, and Gustafson, it was about whether or not to assess interest, and then the decision to do so or the interpretation of, well, what does that mean? That's done under arbitrary and capricious. And with that, I request that this court reverse the district court and enter judgment in Penske's favor, except on the counterclaim, which is part of the decision should be affirmed. Thank you. Thanks to both counsel in the case. The case will be taken under advisement. Thank you, Your Honor.